Did you get a message from me? I left it on your. All right, that's all right. No problem. All right, the next case will be Cash v. USA, or USA v. Cash. Good morning, members of the Court. I'm Mary Ann Barnard, representing Appellant Kevin Patrick Cash. Appellant is asking for outright dismissal of the schoolyard charge and an order to vacate the conspiracy charge. First of all, there are three reasons the schoolyard charge should be dismissed. Insufficient evidence, the addictive prosecution, and the abuse of discretion in admitting the entirely irrelevant and highly prejudicial evidence of other defendants in other cases pleading guilty. The highest hurdle here is to show exceptional circumstances or plain error warranting raising vindictive prosecution for the first time on appeal. Below, I raised it as a downward – part of a downward departure argument. Normally, it's raised as a pretrial motion, but in this case, the justifications for the motion did not solidify until after the sentencing. That's because the most direct evidence of a retaliatory motive was the phone call, and that phone call did not become hard evidence until after the sentencing, because that's when the phone call became an undisputed fact, after I put it in writing so the government had an opportunity to deny it and did not do so. Mr. Cash's due process claim, based on vindictive prosecution, is not waived because there is good cause for not raising it as a pretrial motion. Counsel, Judge Gould, so my question is, what is that good cause? In other words, what's the motivation of not raising it before trial? There were ongoing manifestations of animosity, and I submit vindictiveness, that went up to even the day of trial, the day trial started. And it wasn't the phone call – until the phone call that there was an actual threat. And then – and the phone call came in November 18th. And then the charge came March 15th, which was very close to trial. And like I said, there's a very high standard of proof for vindictive prosecution. But why, again, why would you not raise the issue in a motion right before trial? Well, Your Honor, I would have – at that time, I would have been unable to – The phone call had – had you received it by then? Yes, I had. You had the phone call in the fall, and then in March you get the indictment. Why wouldn't it be a natural to make that – raise that issue then? Well, it was very close to trial, and I knew I would be unable to prove the phone call. I knew I would be unable to prove the phone call. And things died down after that. But on the day of trial, I was again – the prosecution was again interfering with Mr. Cash's decision to go to trial. Again, coming – Ms. Barnard, refresh my recollection. What was the content of the phone call, and who made the phone call to whom? The government made the phone call to me. Now, the government – you mean an assistant U.S. attorney? That's correct. All right. And what was that – what was the content of that phone call? He asked me if I had informed Mr. Cash that it would be – not be a good idea to go to trial. And he also advised me that if I did not advise him it's not a good idea to go to trial, then that would be ineffective right there. That's probably true, right? Pardon me? That's probably true, right? Yes, that's true. But it is encroaching on my attorney-client privilege. And – How does that encroach on your privilege? He's asking me about my discussions with my client. Excuse me? He's asking me about my discussions with my client and the contents thereof. No, he's not. He's saying, I suggest that you tell this to your client. It is attorney-client privilege as you see it. No one can make any suggestions to counsel as to what should happen in the litigation. Well, no, that wasn't the threatening part. The threatening part came in later when – What was the threatening part? I'm still trying to get it. Okay. It wouldn't be a good idea if he went to trial? Isn't that what – Ask me if I told him that. Isn't that what everybody – every attorney trying to settle a case tells the opponent? It's not a good idea to go to trial. You ought to settle for what I'm offering. But that – those plea negotiations were long since finished by this phone call. The plea negotiations were over September 25th, and this phone call came November 18th. My client had already made a firm decision to go to trial. And that was – The firm decisions are known to be changed in prosecutions and in politics. It's true. In this case, the prosecutor was unable to accept my client's firm decision to go to trial. I don't want to take away too much of your time. Do you have some other points you wish to raise? Yes. Well, just as U.S. v. Goodwin says a prosecutor can bring excuses for bringing late charges and overcome a presumption of vindictive motive, I submit that the same thing happened here, where the vindictive motive did not crystallize until after the sentencing. And – You know, I don't quite understand that. What do you mean the vindictive motive didn't crystallize until after sentencing? Well – Could you just say sort of – that's an appellation. I mean, that's a description. But just say a few words about that. How so? Well, how so is from the government's own creation in pleadings that they submitted, the first pleading being the motion to revoke supervised release, and even where they accused the defense of – They made that – they made that motion after sentencing? No, pretrial motion. You said it – you said the vindictiveness didn't crystallize until after sentencing. And I'm saying how so? What crystallized it after sentencing? That's when the phone call became hard evidence, when it was in my – when I had submitted it as part of my argument for downward departure, and the prosecution had an opportunity to deny the phone call, and they did not do so. So until they – until they did not deny the phone call, it wasn't vindictive. Is that right? Well, I realized – It was after they didn't deny the phone call that it was vindictive? I'm just trying to get – I'm not arguing. I'm just trying to get the thread of what you're telling us. It's a totality, Your Honor, where there were various pleadings by the government that manifested animosity, but also the attempt to remove defense counsel – I'm sorry. In the phone call, that came after the attempt to remove defense counsel? Yes. Okay. So in the phone call, the government said, have you passed on – have you told your client he should settle? And if he's still – And they said they were going to bring additional charges. Were going to bring additional charges. That's correct. Is that right? And that's what crystallized after sentencing? That that indeed – They did not deny the phone call. In fact, in their answering brief, they seem to also admit it on page 15 of the answering brief. All right. I understand. And – Counsel, the issue on insufficient evidence on the distribution near the school that was most intriguing to me related to the scale. I just wanted to make sure I understood the significance of that. Because I understand that they found a scale in his apartment and baggies or some other kinds of things that could be used for distribution, but it was not a gram scale. Maybe that's what I read in the brief that I didn't fully understand. So if I've got that right, what's the significance of a gram scale? If someone were conducting distribution of heroin, in this case, they would have to measure – if they were selling it by the gram, they would have to have a scale to measure and package grams or half grams and that sort of thing. And there was no scale found in his apartment in the facts. I thought that I read that there was a scale, but just that there wasn't a gram scale. Are you saying there was no scale at all? I don't recall anything about a scale at all, and specifically there was no gram scale. But I submit that there's insufficient evidence that the heroin in the pencil sharpener was for personal use – not for personal use as opposed to distribution, even with the government's own expert. There's just no definitive evidence one way or another whether it was for personal use or for distribution purposes. And then that – what I submit is an outrageous evidentiary ruling came up where the court allowed a witness, an expert witness no less, to testify that people who didn't have gram scales had pled guilty to drug charges. These anonymous other defendants who pled guilty to drug distribution did not have gram scales either. I submit that that's totally irrelevant, highly prejudicial, and – Well, what if a jury said, gosh, there was no gram scale there? He couldn't have been in distribution. What if a jury said that to itself after hearing your evidence, which I think very – hearing the evidence which very clearly outlined, well, there was no gram scale, was there? That's correct. Well, what if a jury thought, gosh, no gram scale. Maybe you can't find people guilty unless there's a gram scale. Well, yes, I did get a good answer on my cross-examination question of the witness, but that doesn't give the government license to bring in – ask the jury to consider what other defendants do in other cases. But I take it your argument was as it is here partly. You know, there was no gram scale. He couldn't have been distributing from there. There was no gram scale, correct? That's only part of it. The other part is that – That's part of it, right? Right. That's part of your argument. So if I wanted to – I'll submit my brief on that totality. If I wanted to butt that, why couldn't I bring in somebody that said, you know, gram scale is not required for distribution? Is what you're objecting to that he was allowed to testify that in other cases the lack of a gram scale had resulted in convictions, which was, of course, bringing in hearsay testimony as to what other juries had done? Correct. And he was not an expert in convictions. He was an expert in heroin distribution, right? That's correct. Was that objection made? Yes. And where was it? I didn't make that specific objection because I thought it was so obvious and it was immediately overruled. Did your objection just consist of saying objection? I objected and I moved to strike the question and the answer. And the objection was on the grounds of? I didn't say relevance because it was immediately overruled before I could get to that. Did you – I thought it was obvious. Did you make a motion to strike on the grounds of relevance? No. But I submit that that is so prejudicial that it contaminated the entire trial and it related specifically to the schoolyard charge. All right. Thank you very much. Are you intending to save any time for rebuttal? We'll give you two minutes for rebuttal. Okay. Thank you. May it please the Court. Good morning, Your Honors. Mark Enseong for the United States. The claim of vindictive prosecution in this matter was waived by the defendants of the appellant's failure to raise it at any time prior to the filing of their opening brief in this matter. The remedy should be just as was in the Robertson case on which Justice Fernandez sat. Is there any indication on the record that Mr. Cash moved to this house recently or that the Federal Government just learned that the school had been built? I mean, here there seems to be a pretty clear pattern of saying you don't want to plead guilty, fine. We're going to go out and charge you with possession near the schoolyard. Well, Your Honor, there is no evidence that he had moved there recently. The evidence is that he had lived there for some time. The school was not new. But that's the exact problem with this not being raised before is because the record is empty as to why. I could explain it to you. It's not going to be what's in the record because we didn't have the chance to address it when it should have been raised if it was to be raised at all. That's a pretty good answer. All right. But the remedy at this stage is that it should be dismissed just as it was in the Robertson case, as I said, which Justice Fernandez sat on, because none of the Flores-Montano circumstances or factors are present here. There are no exceptional circumstances as to why this could not have been raised at the lower level. This was not an instance where there was a change in the law while it was pending appeal that was the cause of it being raised later. And it's not a purely legal question. In fact, it's almost a purely factual question. Finally, as the district court pointed out at the sentencing hearing, that's at the supplemental excerpt of records, page 620, Mr. Cash's sentence would not have changed in the least, even if he were to prevail on this one particular count, because the other drug charges, the conspiracy count and the attempted possession account, were the ones that were driving his sentence. So by definition, there could not have been any injustice to Mr. Cash because his sentence would, as I said, be wholly unaffected with or without the count 5 being added into the equation. The record also shows that there was no vindictive motive in this case. The defense concedes in their opening brief at page 32 and 33 that the government had the discretion to bring two prior superseding indictments. They don't explain why they don't believe there's that discretion for the final superseding indictment. But if you look at the timeline, it doesn't even bear out their theory here. This phone call, which I did make and which I did suggest to defense counsel, that they talk to their client about the realities of what he might face if he's going to make the plea offer we were making along with the opportunity to cooperate. And that was made on November 14th of 2005. On November 25th of 2005, the third superseding indictment was returned in this matter, and that's at ER 54, which added count 4, which is the attempted possession with intent to distribute. The defense says, well, that's okay. We don't have a problem with that. You had discretion to do that 11 days after the phone call. But now in March of 2006, when count 5 is added in the fourth superseding indictment for the schoolyard charge, you don't have that discretion. Up to November 25th, the second indictment simply had an 844A possession, not with possession of intent, not possession with intent to distribute. It had a conspiracy charge and then a user of drugs in possession of a firearm. Those are the two counts against Mr. Cash. Oh, okay. So you hadn't ñ because the amount of heroin that this man had was rather small and was consistent with the defense that it was for his own use and not for distribution, putting aside scales, putting aside condoms, putting aside the guns that he had, et cetera. Correct. Which was difficult to put aside in the case. Correct. So up to that point, it was a conspiracy and you mentioned possession of firearms in connection with? His being a user of heroin. Right. Counsel, would you clear up for me, please? Was there no scale or was there a scale but it wasn't measuring in grams? Your Honor, my recollection is there was a scale but it was not a gram-type scale. It wasn't one that we felt comfortable we could argue in good faith would be used to weigh drugs. So we didn't address it or mention it at all in our case in chief or at any time in our case. But there was no gram scale found in the apartment. That is true. But the other part of ñ to show I think maybe the most telling to things, so that there was no vindictive motive here, was after this trial, when we got to sentencing, the government recommended minus 2 for acceptance of responsibility based on, in part, the argument that had been made prior to the sentencing hearing but then completed by Mr. Cash's admissions at the sentencing hearing to all of the essential elements that he had been charged with. So clearly if there had been a vindictive motive, because Mr. Cash, we would not have been recommending that he get the benefit of what many defendants get without going to trial. So I think those are the most telling things. Of course, in U.S. v. Bordenkercher, the seminal case in this regard, it clearly tells us that if there is probable cause, the government has discretion to go ahead and proceed. It also says that a defendant, when he being notified of, quote, unpleasant alternatives, that's at page 669 of Bordenkercher, that is clearly within proper parameters and proper plea negotiations. And that's all that was trying to be accomplished with that phone call. I'm a little puzzled. The thing that seems to have troubled the defense somewhat is your motion to remove counsel. That seems like a rather unusual procedure. I can't say that I've ever seen the government making a motion to remove defense counsel on the ground that the government didn't think defense counsel was knuckling under. That was not why, Your Honor. And it is a highly unusual situation. The only time I've ever been faced with that situation, but there were a series of events where the government was getting the impression that Mr. Cash was not being notified of the circumstances, the consequences, if there was any communication whatsoever. There was one point which is cited in an appellant's brief, actually, where the defense counsel was unaware that he had been released into this treatment program that he had been waiting for, and both parties had been unaware of that. But when we found out about it, it was approximately ten days before trial, he had been in this treatment center for approximately a month at that time. So here we are ten days prior to trial, and counsel had had no contact or communication with their client for the month before. And this was just, that was the straw that I guess broke the camel's back, which led me to raise that with the court. And I did not go to the court initially. I raised it directly with defense counsel first because I did not want to have that situation. I expressed to her my concerns, and she basically, well, if you think you need to raise it with the magistrate judge, then go ahead. And so I did. And so that was, it was a highly unusual situation. But, again, I've not been faced with that set of circumstances before, and I felt that it was, had become necessary at that point. Counsel, what was the evidence of prior distributions or sale to Mr. Cash? That is, the witness has sort of turned around and started helping the government. Didn't she say she had sold drugs to him before? Yes, Your Honor. The primary cooperating witness had been to Hawaii on seven or eight prior occasions to deliver heroin to Mr. Cash and his co-defendant, Mr. Seguin. And she indicated that she had delivered heroin to Mr. Cash in, I believe, every one but one of those trips. And this was part of the, a very mechanical set procedure that they went through every single time. This courier would be given them the heroin. She would be transported across the border into the United States from Mexico. She would be driven to Los Angeles International Airport. She would secrete the heroin in her crotch area. She would fly on the plane. She would take a taxi once she arrived in Hawaii to Waikiki. And there were a couple of Waikiki hotels that she stayed in every time. Once she got there, she would call her contact in Mexico. The contact in Mexico would then call Mr. Cash, set up a time, set up a meeting place. The Mexico contact would then call the courier, say, go meet Mr. Cash at this time, this place. And they would go and do it. They would make the exchange. That's how it happened every single time. And so that evidence was clear that this was a routine, standardized procedure that had been repeated over and over, over the course of several months. The sale was, were small quantities in every case. Well, small, I mean, distributable quantities, but two ounces, but definitely a distributable amount that would be for further distribution, not for one's personal use. Even a one gram per day user like Mr. Cash, I mean, there's 28 grams in an ounce. So that would be 56 days of use. And there were, evidence showed that there were trips coming, you know, every couple of weeks during this period of time. So it would have been far more frequently than his supply would have been used up. In regard to the, the, I guess that touches a little bit on the buyer-seller instruction, which I'll bring up now at this time as well. The instruction in this case was proper. There were, there was no distinct objection made by the defense. And where the quote was, a quote, record objection was made, wherein the defense also admitted that the most important parts of the instruction were included. That's at the SCR at pages 500 to 501. Where there's no distinct objection made, there must be, it's a, must be a showing of plain error. As the Court recited earlier today, there must be error, it must be plain, it must have affected substantial rights. What portion of 6.12 was left out? As I see it, the only thing that was left out is the sentence, the fact that a defendant may have bought heroin from another person is not sufficient without more to establish that the defendant was a member of a charged conspiracy. But I don't think there was any evidence here that he bought any, from anybody but Perez. Correct, Your Honor. And that's why. That shouldn't have been given, because that would be referring to a fact which was not in the record. Exactly, Your Honor, and that's precisely why the district court made the adjustment, because it had to reflect the evidence that was before the jury in this case. And there was no evidence that Mr. Cash had ever received drugs from anybody other than Ms. Guerrero. So we believe that the substance was not altered whatsoever by that introductory paragraph. The factors which were set forth, the six points, were included verbatim. Frankly, the government's view is this instruction was not even applicable. No, he left out the word simple. 6.12 says the existence of a simple buyer-seller relationship, and he took that word out and put the existence of a buyer-seller relationship. He did leave that out, but he inserted the word itself later. So I don't know if that, you know, compensates fully, but, you know, it was part of the court's attempt, I think, to model and tailor the instruction to the facts before it. As I was about to say, the instruction in this case really, in the government's view, was not even applicable. It was a generous instruction. The six factors, if you look at them, that lay out whether that should be given or not were not evident in this case. There was a large quantity of heroin involved. There was a standard procedure. Heroin was fronted or sold on consignment. There was a continuing or ongoing relationship. The financial success of the conspiracy depended upon the selling of the drugs by Mr. Cash and the others who it was coming to, and there was a clear understanding that the drugs would be resold. So none of the factors that would lead someone to think that there was a strictly buyer-seller relationship were present, particularly when Mr. Cash never actually spoke or dealt with Ms. Guerrero. All he did was do the exchange of the drugs with her. All the communication was through Ms. Perez in Mexico, where the phone calls would come from Mexico to Mr. Cash and then go back and then the meeting would be set up. So it was clear that it was a conspiracy and that it was much more than the simple buyer-seller relationship that the defense was trying to paint it. Lastly, in regard to the – I'll just touch on the scale. Before we get to that, was there any testimony, and if so, please remind me, that a user of heroin can perceive the results with 1 gram? That he could receive what with 1 gram? Can get an effect with just 1 gram of heroin? You mentioned that 1 gram would be sufficient. He had 2 ounces. That's 56 grams. That's more than you would normally use if you were a heroin user. Where is the evidence that 1 gram gives a jolt? Well, where that evidence – I don't know if there was specific evidence that said it was a jolt, but where it came out was that when Mr. Cash was interviewed after he was arrested and admitted being a daily heroin user, he had admitted using 1 gram a day and said he'd been a heroin user for 10 years. 1 gram or at least 1 gram? Did he make that distinction? My recollection is that he said he used 1 gram a day. Was that admission put into evidence? Yes, it was. I'm out of time. I can address the scale issue if you would like. Otherwise, we will rest on our briefs at this time. I don't have any questions about scales. How about you, Judge Gould? Do you want any? I think I'm satisfied. All right. Thank you very much. Thank you very much. The most important part for the defense on the buyer-sell instruction that was taken out was the portion that says, even where the buyer intends to resell, even where the buyer intends to resell, and further discussions of the judge's rewording, which happened mid-trial. So the objection wasn't as studied as it could have been if it had been done in advance if the judge had read my trial memorandum on that instruction. In mid-trial, he brought out his new wording. So, but I did, in the further discussions of those changes, I did talk about on the record, and that's in excerpts of Record 134, even where the buyer intends to resell, and that would have been particularly helpful to Mr. Cash, because it was on the record in his own admission that he sold it to support his own habit. And as far as the schoolyard charge being more serious, more severe, it is, not in terms of jail time, but it has an enhanced term of supervised release. It has an enhanced term of two years longer. And it's an added charge, and it's a greater charge in terms of years of supervised release. I'm going to ask you this, counsel. Why did the judge give any explanation as to why he took out the words, even where the buyer intends to resell? No, he did not. And you're... And I would cite the Mims case on that. You objected to the giving of the instruction without that phrase? I objected to the rewording in general. And that is at excerpts of Record 134? Yes. And is your position that if he'd given that instruction, you would have been able to argue that with the small amounts included or involved here, you, the jury, would more likely than not have found lack of guilt, right? No, not necessarily. I admit I would have had a much better case if maybe there were three transactions farther apart. But I, the prosecution mentions the various facts that they have. You're not saying that the removal of these words amounts to structural error, do you? I think you have to argue that the removal of these words would have caused harmful error. I will say it's structural error. And I'll cite U.S. v. Mims, 7th Circuit, 92 Federal 3rd, 461. And that buyer-seller instruction was error because the buyer-seller instruction specifically said that the thing purchased had to be not for purposes of resale. And that was an error. So it's, that's why that language was put in there. Well, maybe I haven't made myself clear. It may be error, but don't you have to go one step further and show that had the instruction been properly given, it would have eventuated in a different result? Or you just think that if it's error, that's enough? It's the same thing as not allowing a defendant to see his counsel? Well, we can't really that closely examine jury deliberations because they're secret. I'd say it could have. All right. Thank you very much. I think we've taken you beyond your time. Thank you. Thank you. Okay. The case of Messages v. Cash will stand submitted. Thank counsel for their argument. The next case is Cook v. Avi Casino Enterprises, Inc.
judges: Fernandez, Gould, Bea